Stella Patznsky, Administratrix of Estate of Thomas Patznsky, Deceased, Appellee, v. Frank O. Lowden et al., Trustees, Appellants.

Gen. No. 42,199.

614

Opinion filed March 2, 1943.

MILTON V. THOMPSON, of Chicago, for appellants; MILTON V. THOMPSON, ERWIN W. ROEMER and CHARLES T. SHANNER, all of Chicago, of counsel.

RYAN, SINNOTT & MILLER, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Stella Patznsky, as administratrix of the estate of Thomas Patznsky, deceased, brought suit against the trustees of the Chicago, Rock Island & Pacific Railway Company, under the Federal Employers' Liability Act, to recover damages for the wrongful death of her intestate, who died as the result of injuries sustained in the defendants' railroad yard in Chicago, while engaged in interstate commerce. The jury returned a verdict in her favor for $22,500, and after overruling defendants' motions for judgment *non obstante vere-*

*dicto* and for a new trial, the court entered the judgment from which defendants appeal.

As the principal ground for reversal it is urged that plaintiff's evidence was insufficient in law to sustain her burden of proving (1) that defendants were negligent, and (2) that such negligence was the proximate cause of the accident. The facts disclose that Thomas Patznsky, aged 45, a conductor in charge of a switching crew, came to his death shortly after 4 a. m. March 31, 1939, a cool clear morning, through injuries received underneath a caboose on the south end of track 15 in defendants' Burr Oak yard, Chicago. It is conceded that he was engaged in interstate commerce. There were no eyewitnesses to the accident, but he was discovered, either then dying or dead, between the rails and under the brake beam of the rear and south end of a caboose which was attached to a string of 55 cars standing on the track. His electric lantern was lighted and lying a short distance from him and to the north of his body, and his train list was near-by. When found, he was described as being in a crouched position, with his feet toward the north and his head in the angle of the brake hanger, three or four feet north of the south end of the caboose. There was no evidence of marks on the ties or ground to indicate that he had been dragged or pushed in either direction. It is undisputed that he was in good health on the morning in question and appeared normal in every respect, and the evidence all indicates that he was an experienced railroad man, habitually careful for his own safety.

The Burr Oak yard contained water tanks, a roundhouse, a machine shop, freight houses, yard offices, about 50 railroad tracks, all on the ground level, running parallel and in a general northerly and southerly direction to two or three leads on each end, and was in all respects a typical railroad yard. The tracks were numbered from west to east. During the night the yard was illuminated artificially by flood lights, and

visibility was good. Near Burr Oak avenue, which did not intersect the tracks but passed over them by means of an overpass, and about 200 feet to the west of track 15, a yard office was located, where the men customarily reported to work and where conductors received their train lists and other instructions.

Track 15 was generally known as the Clearing track because a train was made up on that track each night for Clearing, Illinois. From the north lead to the south lead, track 15 held approximately 45 cars, the average length of each being approximately 45 feet.

The manner of making up a train was described by witnesses as follows: All cars in the yard are marked with chalk to designate their destination. The conductor, Patznsky in this case, is furnished a list showing specifically the cars to go into the train. Switching crews engage in shunting or pushing the proper cars from the different tracks onto the track holding the train being made up. They are shunted singly, or in groups of two or more, from both ends of the track, until the train of cars is completed. An inspector then walks along one side of the train to see that all cars are coupled and to connect the air hose between each car. After the locomotive is attached to the head end, air is pumped from the engine through the entire string, until it reaches a pressure of about 70 pounds. For the accomplishment of this operation it is necessary to close the air cock of the end car or caboose, and in this instance it was done. The inspector thereupon walks along the train again, this time from the head end, to test the air in each car and to make an inspection for leaks.

All the witnesses produced at the trial were called by plaintiff. Eight of them were employed by defendants, two others testified as experts on train operations, and several others were called to prove damages.

Deceased was in charge of the crew on the morning of the accident. Part of the train was made up by an-

other crew, and consisted of 35 cars assembled on track
15. These cars were shunted in on this track, singly
or in groups of two or more, from the south lead. One
of the witnesses testified that these cars were thrown
in loosely, and were subsequently coupled by the en-
gine operating from the south. Later, as part of the
operation of making up the train, it became necessary
for Patznsky's crew to go over to track 14, immedi-
ately adjacent, and double back with some cars stand-
ing on that track. This movement consisted of going
in on the north end of track 14, coupling onto a string
of cars standing on that track, hauling them off track
14, up the north lead past 14 switch, closing the latter
switch, then pushing the cars down the lead and in on
track 15 and coupling them onto the cars already
standing on that track.

Patznsky rode the engine over to the north end of
track 14 on this movement and got off there. He evi-
dently did not have a complete list of these cars when
the crew pulled in on track 14, and accordingly he went
to the yard office, located in the south end of the yard,
to get the bills on these cars, and came over from the
office to the rear end of the cars on track 15 just before
the accident. Although defendants say that Patznsky
directed the movement of the cars from track 14 to
track 15, the evidence discloses that he had nothing
to do with this movement; it was initiated by Thomas
J. Keane, who gave the signals and who evidently did
not know where Patznsky was at the time. Shortly be-
fore this doubling-back process was completed, the
other switching crew, who had assembled the 35 cars
on track 15, brought two cabooses from another track
and pushed them in from the south lead onto track 15
and against the south end of the 35 cars standing on
that track. When the northernmost caboose came in
contact with the south end of the cut of cars, it was
coupled on by switchman Frank L. Heath. The south
end of the string of cars was then about three or four

car lengths from the south lead. When this coupling was made Patznsky, who had just come over from the yard office with his bills, stood near the south end of his train, within a few feet of Heath, and was talking with him. As soon as the coupling was made, the crew working from the south proceeded to "stretch" the train. This operation was accomplished by pushing north from one half to two car lengths, then stopping the engine, whereupon the cars, in turn, would also stop. The purpose of this operation was to take the slack out of the couplers and to make sure that the cars were all coupled together.

As the cars were pushed slowly toward the north by the crew bringing in the caboose, Patznsky walked north with them, keeping his position at the south end of the rearmost car and the north end of the first caboose. The most southerly caboose was then uncoupled and moved back away from the other caboose a distance of about one foot. When this had been accomplished Patznsky, in the presence of Heath, went in between the last car of his train and the caboose and coupled up the air hose. He then started to walk alongside the caboose toward the south, while the crew from the south lead was pulling out and going to lunch. This was the last time he was seen alive. Within a half minute after Patznsky started to walk toward the south end of his caboose, the 20 cars from track 14 were shoved against the north end of the 35 cars standing on track 15. The noise of the impact was plainly heard by Heath, who had just walked over to the west side of track 14. There is a conflict in the evidence as to the violence of the impact and the distance which the standing cars were moved during this operation. One of the witnesses, a car inspector, testified that the cars were moved five or six feet south. Racine, a switchman, said that they did not move at all, but he was following the engine near the front of the train and was not in a favorable position to tell whether

the cars at the south end moved. The engineer ventured an opinion that he did not move the cars, whereas Keane, who stood at the north end of the 35 cars and made the coupling with the 20 cars being pushed in, testified that the north car was moved six or eight feet, but he did not know whether the whole train was moved or not. The evidence is clear that there were no further movements in either direction, nor was there any movement of the 35 cars after they were "stretched" and prior to the doubling-back movement from track 14. The evidence discloses that the doubling back and the shoving south were done in response to signals given by Keane, who directed the movement. As heretofore indicated, Keane did not know where Patznsky was when the signals were given which resulted in the train being shoved back south.

It is urged by defendants that plaintiff failed to make out a prima facie case because there was no proof as to what Patznsky was doing when he was injured; that since there were no eyewitnesses, the verdict is predicated on surmise and speculation; that "no one knows the manner in which Patznsky met his death, and though plaintiff's counsel asked almost every witness working in the yard that morning who was called at the trial whether he had any theory as to the cause of the accident, none could even speculate as to the cause of the injury and death"; and they indulge in several theories, none of which is supported by the evidence, that he may have fallen under the train "by reason of stepping upon some soft area or hole" or that he fell in "attempting to enter the door of the caboose" or that he may have been "struck by a train being operated on either track 14 or track 16 and in some manner thrown under the cars on track 15." The only plausible explanation of the accident which can be supported by the evidence adduced upon the hearing is that before the 20 cars were pushed against the 35 cars standing on track 15, Patznsky, in the course

of his duty, had gone to the rear end of the caboose which had been coupled to the 35 cars, to close the air line on the rear end of the caboose or to place a marker on the rear end of the caboose, without which the train could not leave the yard. This conclusion is supported by the following evidence. Before the caboose was coupled on the south end of the cars on track 15, the most southerly of these cars was three or four car lengths north of the lead. Two cabooses were placed on the south end of the train and then all the cars were shoved a couple of car lengths northward, so that the last caboose must have then stood where the most southerly car had been, three or four car lengths from the lead. After the train was shoved south by the movement which caused Patznsky's death, the cabooses stood much closer to the lead, as testified to by Gordon Harris, a switchman, who admitted that the most southerly caboose, when he came back after he had heard that Patznsky was hurt, was about a car length from the lead. Although some of defendants' employees who had been called as witnesses by plaintiff testified that the cabooses had not been moved southward by the impact of the 20 cars, Harris's testimony indicates that they had been so moved.

In this connection an explanation of the air-brake system is necessary to an understanding of Patznsky's movements before the accident. The brakes are controlled by an air line running from a pump or compressor in the engine throughout the entire length of the train. Each car has an air hose on each end, which can be connected up with the corresponding hose on the adjacent car, and there is also an angle cock on each end of the cars. These angle cocks may be turned off, in which event the continuity of the air line will be broken and the brakes on all the following cars become inoperative. However, if the angle cocks are opened with the air hose connected, the brakes can be applied by the engineer. Unless the angle cock on the

rear of the last car is closed, no pressure can be kept in the air line.

In the instant case, before the cabooses were switched onto track 15, the angle cock on the most southerly car on that track was closed by the inspector, who then walked north along the east side of the track coupling up the air hose. When the caboose was coupled on, in order to connect up its brakes it became necessary to couple the air hose to the car on the north and close the angle cock on the south end of the caboose, which had become the rear end of the train. It was indisputably part of Patznsky's duty to connect up the air in his train. None of the crew were near at hand, all of them being more than 35 car lengths distant, and consequently Patznsky, in the performance of his duty, coupled the air hose at the north end of the caboose. Having done so, he started in the direction of the angle cock at the other end of the caboose, when he was last seen. He was found under the caboose, a few feet to the north of the south end thereof, his feet pointing toward the north end and his body crouched under the brake beam near the south end of the caboose, in a position in which he would undoubtedly have been thrown if the train was moved toward the south while he was closing the angle cock. The evidence discloses that after the accident the angle cock was found closed. There was air pressure in the caboose, and the air line was therefore undoubtedly connected all through the train and closed at the rear. He was walking in the direction of the angle cock when last seen, and shortly thereafter the train was shoved south on a signal given by a switchman who did not know where Patznsky was at the time. After the accident he was found in the position heretofore described, with his lantern a few feet to the north and his train list near-by, between the rails of the track. We think it was reasonably inferable from these circumstances and the jury evidently found that he came to his death

while standing between the rails at the angle cock on the south end of the caboose, as a result of being pushed over by the impact of the 20 cars from the north against the 35 cars standing on track 15, and thus crushed under the brake beam near the south end of the car. In our opinion the proof adduced excludes any other reasonable hypothesis or theory.

It is urged by defendants, however, that the coupling of the 20 cars to the 35 cars standing on track 15 was made in an ordinary manner, that the engine was moving, but at a speed of only two or three miles an hour, and that there was no unreasonable noise running along the train from north to south. As heretofore stated, there was a conflict in the evidence on this phase of the case. Several witnesses who testified that the coupling was made in an ordinary manner, also admitted that if the cars at the south end were pushed six or eight feet, of which there was some evidence, it would indicate that they had been bumped violently, and that such an operation would be extraordinary and unexpected. The record discloses that the entire train was pushed several feet to the south by means of the last movement making up the train, and under the evidence and instructions of the court, we think the jury was warranted in concluding that this movement was extraordinary and unexpected, made without any previous warning to Patznsky whose whereabouts were then unknown, and therefore constituted negligence.

On the question of negligence, defendants complain that the court refused the following instruction tendered by them: ''The fact that plaintiff's intestate was struck and killed by the train in question of the defendants is not in and of itself alone any proof that the defendants were guilty of the negligence charged against them in plaintiff's complaint, or any paragraph thereof, nor does such fact in and of itself alone create any presumption that defendants are liable to respond

in damages in this case, but before the plaintiff can recover the burden is upon her to prove by a preponderance or greater weight of the evidence that defendants were guilty of negligence, and that such negligence, if any, proximately contributed to cause the injuries complained of.'' However, since all the material parts of this instruction were included in defendants' instruction 13a, it was not necessary to repeat the charge. The instruction given was stronger in favor of defendants and more comprehensive on the same subject than the one refused, and defendants were not entitled to more than one instruction on the same phase of the case. *Doran v. Boston Store of Chicago,* 307 Ill. App. 456; *Minnis v. Friend,* 360 Ill. 328.

It is next urged that Patznsky assumed the ordinary risks of his employment, and that under the evidence his injury and death resulted solely and proximately from such risk. This contention is predicated on the theory that the movement by which he was injured was usual and customary. As heretofore stated, the evidence on this question was conflicting, but there was sufficient evidence to justify the inference that the coupling was made in an extraordinary manner, unexpectedly, without warning, and therefore negligently. The cases are generally to the effect that under the circumstances Patznsky did not assume the risk incidental to the negligence of his fellow employees unexpectedly and suddenly arising. *Chesapeake & Ohio Ry. Co. v. Proffitt,* 241 U. S. 462; *Reed v. Director General of Railroads,* 258 U. S. 92; and *Chicago R. I. & P. Ry. Co. v. Ward,* 252 U. S. 18. Moreover, he was not required to exercise ordinary care to discover a danger due to the negligence of the master's servants, and failure to exercise ordinary care, which is but another name for contributory negligence, is not a defense to an action under the Federal Employers' Liability Act. *Gila Valley, G. & N. R. Co. v. Hall,* 232 U. S. 94; *Chesapeake & Ohio Ry. Co. v. De Atley,* 241 U. S. 310. Since

the date of this accident, an amendment to the Federal Employers' Liability Act abrogates the defense of the assumption of risk, thus expressing the public policy to do away with defenses of this character.

The cause was fairly tried. The instructions narrowed the case to a consideration as to whether the backing of the train constituted negligence, and the jury found that it did. Upon the record presented we are of opinion that the verdict is supported by the evidence. The judgment of the superior court is therefore affirmed.

*Judgment affirmed.*

SULLIVAN, P. J., and SCANLAN, J., concur.